# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

TASMEIA S. BEMBRIDGE,

                                    Plaintiff,

           -v.-                           3:15-CV-745
                                           (DNH/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                   Defendant.

PETER A. GORTON, ESQ., Attorney for Plaintiff
GRAHAM MORRISON, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT and RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Court Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.   <u>PROCEDURAL HISTORY</u>

On June 11, 2012, plaintiff protectively filed an application for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning September 1, 2011 due to Systemic Lupus Erythematosus ("SLE"). (Transcript ("T") 175-86).[1] Plaintiff's applications were denied initially on September 17, 2012. (T. 81, 82). Plaintiff requested a hearing which was held on January 16, 2014 before Administrative Law Judge ("ALJ") Jennifer Gale Smith, at which plaintiff and a vocational expert ("VE") testified. (T. 30-80). On April 23, 2014, ALJ Smith issued a

---

[1] Plaintiff's protective filing date is not listed on her applications. Rather, it is listed on her initial denial forms. (T. 81, 82).

decision denying plaintiff's application for benefits. (T. 12-22). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 28, 2015. (T. 1-6).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of

2

the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include

that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859

F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its

interpretation of the administrative record for that of the Commissioner, if the record

contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v.

Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence

in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles

v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ

explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ

cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz

v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No.

09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Plaintiff's brief includes a summary of most of the medical and testimonial

evidence in the record. (Pl.'s Br. at 2-7) (Dkt. No. 12). Defendant has incorporated the

facts as stated by ALJ Smith in her April 23, 2014 decision. Although plaintiff's

counsel has generally been accurate in stating the facts, there are a few errors in his

recitation. Plaintiff's reply brief admits to unintentionally misstating the facts of a

consultative physician's report with regard to plaintiff's ability to sit. (Dkt. No. 16).

Plaintiff's counsel has withdrawn any mistaken references. (*Id.*) Rather than reciting all

the medical and testimonial evidence at the outset, the court will discuss the relevant

details below, as necessary to address the issues raised by plaintiff, with any exceptions

or additions as noted.

## IV.   **THE ALJ's DECISION**

The ALJ found that plaintiff's SLE was a severe impairment at step two of the disability determination. (T. 15).  However, plaintiff's SLE did not meet or medically equal the severity of a listed impairment at step three. (*Id.*)  The ALJ then found that plaintiff had the residual functional capacity ("RFC") to perform sedentary work, with some limitations.  She could frequently perform fine-motor activities with her dominant right hand, but only occasionally perform fine-motor activities with her left hand.  She could occasionally push and pull with her upper and lower extremities, and she could occasionally climb ramps and stairs, balance and stoop, but could not climb ladders, ropes, or scaffolds, crouch, kneel, or crawl. (*Id.*)

The ALJ cited plaintiff's testimony extensively, and determined that, although her symptoms would affect her daily functioning, the record "as a whole" did not support the extent of the limitations that she alleged. (T. 17).  The ALJ gave "considerable weight" to the consultative examination by Dr. Justine Magurno; but because plaintiff had never complained of any problems reaching, the ALJ rejected the doctor's finding that plaintiff's ability to reach would be limited. (T. 17).  The ALJ gave only "some" weight to plaintiff's treating sources, Dr. Henda Bouali and Nurse Practitioner ("NP") Kelly Miller, who completed three RFC evaluations in addition to their contemporaneous progress notes. (T. 18).  The RFC "questionnaires" indicated that plaintiff could lift up to five pounds, up to three hours per day, could only sit for a total of four hours and stand/walk for a total of one hour in an eight-hour workday,

would have to change positions every thirty minutes, and required more than one ten-minute rest period per hour. (T. 17). They also reported that plaintiff's pain and the side effects of plaintiff's medication would moderately limit her ability to concentrate and sustain work pace. (*Id.*)

Dr. Bouali and NP Miller submitted two addenda to their questionnaire, stating that plaintiff's condition was "about the same." The first addendum indicated that, although plaintiff could reach, handle and perform fine motor activities with both arms and hands for up to one third of each working day, her condition would cause her to be absent from work four days per month. (T. 17-18).

In giving plaintiff's treating sources only some weight, the ALJ found that the answers on their questionnaire and addenda were inconsistent with their contemporaneous progress notes which indicated, inter alia, that plaintiff was "doing well," and was "back to school" to get her GED. (T. 18). The contemporaneous progress notes also stated that plaintiff had very few of the usual symptoms of SLE such as discoid rash, dizziness, headache, malaise, retinitis, seizures, psychiatric symptoms, Raynaud's phenomenon and others. (*Id.*) The contemporaneous reports generally indicated normal musculoskeletal examinations. The ALJ did not adopt Dr. Bouali's and NP Miller's finding that plaintiff would have to change positions frequently because plaintiff indicated that sitting was "not a problem" in one of her Function Reports, and Dr. Magurno found that plaintiff was not limited in her ability to sit. (*Id.*)

The ALJ also specifically rejected Dr. Bouali and NP Miller's determination that

plaintiff's medications would affect her concentration, work pace, or attendance because none of the contemporaneous reports found that plaintiff was having serious side effects as a result of her medications. (*Id.*) While plaintiff alleged that she suffered from fatigue, there was no evidence that the fatigue caused "significant" concentration deficits, which would result in frequent absences from work. (*Id.*) The ALJ also gave "little weight" to the "independent medical examination" performed by Dr. Lawrence Wiesner, who determined that plaintiff was significantly limited in many areas, including her concentration and work pace. (T. 19). The ALJ found that Dr. Wiesner's RFC assessments were inconsistent with "each other and with the objective evidence . . . ." (*Id.*)

The ALJ also found that the "record as a whole" reflected a greater level of sustained functioning than plaintiff alleged, noting that plaintiff "displayed much greater symptoms and limitations during the two exams she underwent in connection with her application for disability benefits." (T. 19). The examinations that were conducted by her treatment providers were "persistently normal." The ALJ also noted that plaintiff stopped working because of complications with her pregnancy, rather than the SLE itself. The ALJ also questioned the plaintiff's "overall attachment to the workforce." (*Id.*)

Because plaintiff had no "past relevant work," and had additional limitations that would reduce the number of sedentary jobs that plaintiff could perform, the ALJ called a vocational expert ("VE") to testify at plaintiff's hearing. (T. 20-21). The VE was asked various hypothetical questions and determined that a person with plaintiff's

limitations would be able to perform jobs which existed in significant numbers in the national economy. (T. 21).

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.    The ALJ failed to properly consider the combined effects of plaintiff's pain, physical impairments, and medication side-effects on her ability to maintain attention and concentration, work at an acceptable pace, and/or maintain acceptable attendance. (Pl.'s Br. at 8-15).

2.    The ALJ's determination that plaintiff could perform the lifting requirements of sedentary work is not supported by substantial evidence.[2] (Pl.'s Br. at 15-18).

3.    The ALJ failed to properly consider plaintiff's limitations in fine-motor activities with her dominant right hand. (Pl.'s Br. at 18-20).

4.    The VE's testimony is flawed by an "Improper and Incomplete Hypothetical." (Pl.'s Br. at 20-22).

Defendant argues that the Commissioner's determination is supported by substantial evidence, and that the complaint should be dismissed. Plaintiff filed a reply brief. (Dkt. No. 16). For the following reasons, the court agrees with defendant and will recommend dismissal of the complaint.

---

[2] This section of plaintiff's brief also contains an argument that the ALJ erred in finding that plaintiff could perform the sitting requirements of sedentary work. (Pl.'s Br. at 16). However, plaintiff's counsel has acknowledged that he made a factual error and has withdrawn the argument in his reply brief. (Dkt. No. 16). Plaintiff still maintains that the ALJ erred in finding that she could perform the lifting required for sedentary work. The court has listed only the surviving argument.

# VI.   RFC/TREATING PHYSICIAN/WEIGHT OF THE EVIDENCE

## 1.   Legal Standards

### a.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."   A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL

3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2. Treating Physician

"Under the treating physician rule, deference is given to the opinions of the physician who has provided the primary treatment for the patient." *Rugless v. Comm'r. of Soc. Sec.*, 548 F. App'x. 698, 699-700 (2d Cir. Dec. 19, 2013). "SSA regulations advise claimants that a treating source's opinion on the issues of the nature and severity of [their] impairments will be given 'controlling weight' if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Green Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2004). An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

In making her determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed

10

impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that she applies and the weight that she accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### B.    Application

Plaintiff argues that in determining her RFC, the ALJ did not properly take into account the limitations in plaintiff's ability to "maintain adequate work pace, attention, concentration, or attendance." (Pl.'s Br. at 8-15). In making this argument, the plaintiff claims that the ALJ improperly failed to give plaintiff's treating physician and nurse practitioner controlling weight, and instead, substituted her own judgment for "competent medical opinion." (*Id.*)

Plaintiff has been treated by various medical professionals at United Health Services ("UHS"), including Dr. Graham Galen, M.D.; Dr. Henda Bouali, M.D.; and Nurse Practitioner ("NP") Kelly Miller. These medical professionals have authored many narrative reports. (T. 308-62, 375-78, 386-91). In addition to the narrative reports, Dr. Bouali and NP Miller have completed a "Questionnaire," and two "Addenda" to the Questionnaire which contain most of the information found in an RFC evaluation. (T. 302-303, 373-74, 379-80). The first Questionnaire is dated

September 20, 2013, the first "Addendum" is dated December 19, 2013, and the second "Addendum" is dated January 11, 2014. (*Id.*)

These three Questionnaires are essentially "check-box" forms, prepared by plaintiff's counsel, together with some questions requiring a narrative response. The forms are signed by both NP Miller and Dr. Bouali, but it is evident they were prepared by NP Miller, based on the handwriting on the form. The forms reflect very serious limitations, including the statement that plaintiff has "intermittent flares," with pain lasting from hours to days and takes pain medication which makes her "drowsy." (T. 302). The September 2013 Questionnaire states that plaintiff's pain and/or side effects from her medication cause "moderate" limitations in her concentration and "moderate" limitations in her ability to sustain work pace. (*Id.*) "Moderate" is defined on the form as a "limitation of function . . . of 20% or greater but not precluding the function." (*Id.*) The Questionnaire also states that plaintiff would need more than one ten-minute rest period per hour, she could only sit for four hours and stand/walk for "approximately 1 hour" out of an eight-hour day. (T. 302, 303). Plaintiff would also have to change positions every thirty minutes. (T. 303).

Plaintiff could lift from 0-5 pounds "[u]p to 3 hours per day," but could never lift over 5 pounds. (T. 303). The Questionnaire lists plaintiff's medications and asks the author to "[s]tate [the] side effects, if any, of said medication," specifically with reference to any medications that "cause fatigue or require the patient to rest after taking same." (T. 303). The side effects listed are nausea, vomiting, dizziness,

12

drowsiness, and discoloration of the retina, affecting "VF."[3]

The first Addendum indicates that plaintiff's condition was "almost" the same, and the limitations were "about" the same. (T. 373). There is a specific section entitled "Off Task," and the first question asks whether the "conditions" and/or "any side effects of medication" would have "the following effects." (*Id.* ¶ 2). The first two subsections ask whether "they" would cause plaintiff pain or fatigue, and the answer "no" is checked for both. (*Id.* - ¶ 2(A)(a), (A)(b)). The next two questions ask whether "the condition, the pain from the condition and/or side effects of medication diminish" concentration and work pace. The answer "yes" is checked for both of these questions. (*Id.* - ¶¶ 2(A)(c), (A)(d)). The form also indicates a "yes" answer to whether the plaintiff would "need to rest at work." (*Id.* - ¶ 2(A)(e)).

The following section addresses "Absenteeism." (*Id.* ¶ 3). This section indicates that plaintiff's condition would produce "good" and "bad" days, and that the "bad" days would cause her to miss four work days per month. (*Id.* ¶ 3(A), 3(B)). The December 19, 2013 Addendum also indicates that plaintiff could use both hands for fine motor activity "up to 1/3 of each working day," and that plaintiff could use both her right and left arms and hands for reaching and handling "up to 1/3 of each working day." (T. 374 - ¶ 4). The final "Addendum" is dated January 11, 2014, but is identical to the December 19, 2013 "Addendum." (T. 379-80).

Plaintiff argues that the above Questionnaires, together with the Addenda, authored by plaintiff's treating sources, should have been given controlling weight and

---

[3] "VF" stands for visual field. (T. 388, 390).

therefore, plaintiff should be found disabled because the limitations therein, particularly the limitations regarding concentration and work pace, "are beyond employer tolerances," according to the VE who testified at the hearing. (Pl.'s Br. at 9). Plaintiff argues that these reports are the "only opinions of record on this issue, . . . and there is no contrary evidence," so the ALJ was "obliged" to accept these conclusions. (*Id.*)

In support of this argument, plaintiff also cited a consultative report by Dr. Lawrence Wiesner, D.O., who performed an "orthopedic" examination on October 25, 2013. (T. 370-72). Dr. Wiesner completed a document entitled – "Work Capacities."[4] (T. 363-66). In his RFC evaluation, Dr. Wiesner states that plaintiff could only sit for "less than 2 hours" in an eight-hour day, and she could only stand/walk for "less than 2 hours" in an eight-hour day. (T. 363). Dr. Wiesner opined that plaintiff would only be able to sit or stand for ten to fifteen minutes before having to change position, she would have to "walk around" every fifteen to twenty minutes, and she would need to be able to change positions at will. (T. 363). Dr. Wiesner stated that plaintiff would have to "occasionally" lie down at unpredictable intervals during the day. (*Id.*)

Dr. Wiesner found that plaintiff could "rarely" twist, stoop, or crouch, and she could "occasionally" reach and handle, and she could "frequently" use her fingers. (T. 364). Dr. Wiesner indicated that plaintiff could "frequently" lift up to five pounds, "occasionally" lift up to ten pounds, "rarely" lift ten to twenty pounds, and "never" lift over twenty pounds. (*Id.*) He estimated that plaintiff's impairments would cause her to be absent from work more than three times per month. (*Id.*) Dr. Wiesner also listed

---

[4] The document essentially includes much of the information in a "Medical Source Statement," or RFC evaluation.

plaintiff's medications and stated that they caused "fatigue." (T. 365). Finally, he

opined that the plaintiff's conditions "and/or" side effects from her medications would

cause "moderate" limitations in both concentration and ability to sustain work pace,

with "moderate" defined as "limited between 20% and 30%. (*Id.*)

The ALJ found that although NP Miller and Dr. Bouali were treating sources,

their opinions were only entitled to "some" weight because their RFC evaluations were

"inconsistent with their relatively minor examination findings." (T. 18). The ALJ gave

"little weight" to Dr. Wiesner's RFC because his narrative findings and his RFC

evaluation were inconsistent with each other "and with the objective evidence . . . ." (T.

19). The ALJ stated that Dr. Wiesner's narrative report did not mention any limitations

that plaintiff would have sitting, standing, or walking, and yet the RFC evaluation had

very serious limitations on all of these functions. (T. 19). The ALJ also rejected Dr.

Wiesner's opinion that plaintiff would need to change positions frequently and would

have to be absent from work more than three times per month because of her

impairments.

The ALJ did not err in her analysis of the medical records.[5] Plaintiff cites to

several of the Miller/Bouali records which indicate that plaintiff suffered from various

symptoms[6] of her SLE such as dizziness, vision changes, fatigue, and headaches and

---

[5] Because plaintiff has already conceded that the ALJ's finding that plaintiff could perform the sitting requirements of sedentary work, I will focus on the other RFC findings with which plaintiff disagrees.

[6] It is important to note that there is a difference between "side effects" of medication, and the symptoms of SLE as an impairment. SLE can cause a variety of symptoms, including headaches, fatigue, malaise, vision changes, photosensitivity and various others. (*See e.g.* T. 386). In each of the treating physician's narrative reports, the effects of the disease are listed, with a statement of whether

argues that the ALJ's finding that the treatment notes "repeatedly" failed to indicate such symptoms was "incorrect." (Pl.'s Br. at 11). However, as the ALJ noted, there are many reports by the same treating sources in which plaintiff denied many of the same symptoms. (T. 308-10,[7] 321,[8] 325,[9] 329,[10] 375-76,[11] 386-88[12]). In addition, as the ALJ noted, there is no indication that plaintiff's medications caused nausea or vomiting.

As support for the presence of medication "side effects," plaintiff cites to the Questionnaire from NP Miller and Dr. Bouali, where the question asks: "State side effects, if any, of said medications . . . ." (T. 303). NP Miller answered that the side effects of plaintiff's medication were nausea, vomiting, drowsiness, and discoloration of retina, which affected the visual field.[13] (Id.) However, plaintiff has never alleged

plaintiff was experiencing those symptoms. The "side effects" of plaintiff's medication were listed by Dr. Wiesner on October 25, 2013. (T. 370). He listed only "fatigue" as a medication side-effect. (Id.)

[7] On September 20, 2013, plaintiff stated that although she suffered from fatigue, she did not have dizziness, headaches, or vision changes. Her musculoskeletal examination was normal, except for some muscle spasm in her lumbar spine. (T. 310). She denied dizziness, gait disturbance, and seizures. (Id.)

[8] On May 29, 2013, plaintiff stated that she was experiencing dizziness, but denied fatigue, headaches, and vision changes. (T. 321).

[9] On February 20, 2013, plaintiff alleged that her pain was 0/10, that her SLE was "stable," and that although she suffered from anthralgias and dizziness, she denied fatigue, headaches, and vision changes in addition to a variety of other symptoms. (T. 325).

[10] On October 18, 2012, plaintiff was experiencing anthralgias and dizziness, but denied fatigue, headache, and vision changes, in addition to many other possible symptoms. (T. 329).

[11] On October 23, 2013, plaintiff was experiencing arthralgias, but denied fatigue, headache, dizziness, malaise, and a variety of other side effects of the disease. (T. 375-76).

[12] On March 25, 2014, plaintiff was experiencing arthralgias, fatigue, and photosensitivity, but denied dizziness, headache, malaise, vision changes, and other problems associated with SLE. (T. 386-88).

[13] NP Miller may have been citing "possible" side effects of the medications.

16

that her medications caused nausea and/or vomiting.[14]  Dr. Wiesner cited only fatigue as a medication side effect. (T. 370).  Thus, the ALJ was correct in finding that plaintiff did not suffer from nausea or vomiting as a result of her medications.

At the hearing plaintiff testified that her medications "help[] a lot," but made her "a *little*, you know, sleepy." (T. 75) (emphasis added).  She also used the term, "drowsy," but she never mentioned dizziness, nausea, or vomiting. (T. 73-76).  Plaintiff testified that the Plaquenil "messes with my eyes." (T. 73).  However, the treating physician's notes do not indicate any vision changes.  On March 25, 2014, although plaintiff's symptoms were "negative" for "vision changes," the treating providers indicated that plaintiff should have a visual field examination. (T. 386).

The ALJ's finding that the Questionnaire responses reflected much greater restrictions than the narrative reports indicate is supported by substantial evidence.  In the Miller/Bouali Questionnaire, NP Miller wrote that plaintiff's "pain" and the side effects of her medication would cause "moderate" limitations in plaintiff's concentration and ability to sustain work pace. (T. 302).  However, in the contemporaneous progress notes, the plaintiff's allegations of pain are not consistent.  Plaintiff's stated pain level fluctuates from as high as 7/10 to as low as 0/10. (T. 325, 339, 376).  The notes frequently state that she is "doing well," and has gone back to school to get her GED. (T. 308, 312, 316, 321, 375, 386).  On May 14, 2012, plaintiff's pain was listed as 0/10, and the progress notes state that "she cannot do heavy jobs." (T.

---

[14] In fact, on the first page of the original Questionnaire, NP Miller stated that plaintiff takes "pain medication that makes her drowsy." (T. 302).  NP Miller states no other side effects from plaintiff's medication until the following page.

339).  The same report "suggested VESID for job search." (T. 341).  The court also notes that while the introductory paragraph states that plaintiff was suffering from "fatigue" as a result of the illness, the next page states that her "review of symptoms" was "negative" for "change in appetite, fatigue, malaise and weight loss." (T. 339-40). The plaintiff's musculoskeletal examinations are generally normal, with full ranges of motion in all areas, with only minor exceptions. (T. 310, 341, 314, 318, 323, 327, 331, 336,[15] 340-41,[16] 345,[17] 352, 377).  In fact, Dr. Magurno noted in her consultative opinion that she reviewed some of plaintiff's older medical records,[18] and plaintiff's joint range of motion was "persistently normal."[19] (T. 236).

The ALJ also noted that plaintiff displayed "much greater symptoms and

---

[15] Plaintiff did exhibit "mild wrist tenderness" but the rest of the examination was normal. (T. 336).

[16] There was mild tenderness in plaintiff's hips. (T. 341).

[17] Plaintiff had tenderness in her hips. (T. 345).  However, it must be noted that this record is dated February 24, 2012, and the doctor opined that plaintiff's soreness could be related to the fact that she went off of all her medications during her pregnancy. (T. 345).  The records indicate that plaintiff did quite well while off her medications. (T. 349) ("overall doing well . . . more aching, but tolerating well without meds." (*Id.*)  This report is dated December 30, 2011, almost four months after plaintiff's alleged onset date of September 1, 2011.

[18] Although Dr. Magurno states that the most recent record that she reviewed was dated May 14, 2012, the later records are consistent with this statement.

[19] The court also questions the amount of attention given by the treating providers when completing the Questionnaire and Addenda, which are also internally inconsistent.  The first two questions in a section of each Addendum entitled "Off Task" ask whether the plaintiff's "conditions" and/or the side effects of any medications cause pain or fatigue. (T. 379, ¶ 2).  Both questions have "No" checked. (Id., ¶¶2(A) (a), 2(A)(b)).  The next two questions ask whether the conditions, the pain from the conditions, and/or the side effects of the medication diminish concentration or work pace. Each of these questions has "Yes" checked." (Id. ¶¶ 2(A)(c), 2(A)(d)).  If this is an error, then NP Miller and Dr. Bouali made the error twice because, although the addenda were signed on two different dates, the responses to all the questions are the same.

limitations during the two exams she underwent in connection with her application for disability benefits . . . than she did during any of the exams conducted by her treatment providers. (T. 19). This is consistent with the medical reports.[20] Dr. Magurno's evaluation was dated August 16, 2012. (T. 285-88). Plaintiff stated that her pain level was 8/10,[21] and she exhibited limping, loss of strength in her hands, and multiple tender spots. On August 23, 2012, plaintiff was examined by her treating physicians, who noted no abnormality whatsoever in her musculoskeletal examination, other than some "mild" tenderness in plaintiff's left wrist. (T. 336). Plaintiff had no edema and full range of motion in all the joints tested. (*Id.*) She noted her pain level as "5/10." (T. 334). Most of the treating provider's notes do not mention plaintiff's gait. However, on October 23, 2013, even though plaintiff was complaining about knee pain, her gait is listed as "normal" as are her other physical findings. (T. 377). Although she exhibited decreased range of motion in her shoulders during Dr. Wiesner's October 25, 2013 examination, her treating providers noted "normal" shoulder examination on October 23, 2013. (T. 371, 377).

Generally, her treating physician's notes indicate pain levels from 0/10 to 7/10.[22]

---

[20] The court notes that this comment by the ALJ is more related to plaintiff's credibility. "An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (citation omitted). Although plaintiff does not argue that the ALJ erred in assessing her credibility, it does appear to be an important part of the ALJ's analysis, as is her comment that she questioned the plaintiff's "attachment to the workforce" based on the "sporadic" nature of her previous employment. (T. 19).

[21] In fact, 8/10 was the highest pain level that plaintiff ever reported.

[22] She reported this level of pain on only one occasion. (T. 381). Most of the time, plaintiff reported pain of 5/10 or less. (T. 312, 321, 325, 334, 339, 343, 376, 387, 390, 394). On September 20,

On five occasions, she stated that her pain was 0/10. (T. 325, 339, 376, 387, 394). While the record states that SLE will result in "good days" and "bad days," plaintiff's treating physicians have seen her consistently, and her physical examinations have consistently shown normal ranges of motion and moderate pain levels. There are no narrative reports from her treating physicians that show the degree of limitation that she exhibited to the consultative physicians. Thus, the ALJ's observation was supported by substantial evidence.

The ALJ rejected the Miller/Bouali and Wiesner opinions regarding plaintiff's ability to maintain concentration, work pace, and attendance. (T. 18, 19). The ALJ found that these opinions were speculative and not supported by the record. As stated above, the answers that Miller/Bouali gave on the "Questionnaire" and its Addenda were not consistent with their treatment notes, and the ALJ was correct in stating that there was no mention of plaintiff's condition or her medications causing the degree of symptoms or side effects that would severely limit the plaintiff's concentration, work pace or attendance, even though plaintiff does suffer from "fatigue."

The ALJ also noted that plaintiff did not indicate that she had problems paying attention in her July 23, 2012 function report. In her function report, she stated that she could "read, watch movies, manage her finances, and follow both spoken and written instructions." (T. 19) (citing T. 224-25). In her function report, she stated only that her medications made her "a little sleepy," which is consistent with her hearing testimony. (T. 75, 230). As stated above, the treating physician's notes consistently state that

2013 and on June 26, 2013, she reported a pain level of 6/10. (T. 309, 316).

plaintiff was doing well, and she was back in school trying to get her GED. Such activity supports an acceptable level of concentration, attention, and pace.

In addition to the non-exertional impairments discussed above, plaintiff argues that the ALJ erred in failing to accept Dr. Bouali's opinion that plaintiff can only lift up to five pounds for three hours during an eight hour workday, rendering her unable to meet the lifting requirement for sedentary work.[23] Dr. Wiesner stated in his RFC that plaintiff could lift up to five pounds frequently, five to ten pounds occasionally, ten to twenty pounds rarely, and never more than twenty pounds. (T. 364). Dr. Magurno stated that plaintiff had "marked" limitations for pushing, pulling, lifting, carrying, and left-sided fine motor skills." (T. 288). Although the ALJ rejected parts of each of the RFC evaluations, the ALJ also found that plaintiff's daily activities were "generally consistent with a sedentary level of exertion." (T. 19-20). Plaintiff could dress, pick up after her children, prepare simple meals, go out to a restaurant with her children, walk to a nearby store, do light shopping, read and watch television. (T. 20). The ALJ also cited plaintiff's function report, in which she stated that she could wash dishes, do laundry, sweep with assistance, and use public transportation.[24] (T. 20). Her function

---

[23] The full range of sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a); SSR 96-9p. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sedentary work "generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day." *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing SSR 83-10, 1983 WL 31251, at *5).

[24] The court also notes that in early 2012, after her baby was born, she took care of the baby without the help of her husband until he joined the family three months later. (T. 64). Although plaintiff stated that her older son helped her (the court assumes that her older son was in school during

21

report also states that sitting was "not a problem," and that she could reach. (T. 226). When the ALJ asked plaintiff at the hearing if she could lift ten pounds, she stated that "Well, I really don't." (T. 66). She testified that her husband helps her do everything, but she did not testify that she "could" not lift, only that she "did" not lift because he does not "let" her lift anything heavy. (T. 66).

Plaintiff also argues that the ALJ was incorrect in determining that plaintiff could perform fine motor activities with her dominant right hand. (Pl.'s Br. at 18-20). The ALJ found that plaintiff could perform right-handed fine motor skills "frequently," while she could only perform left-sided fine motor skills "occasionally." (T. 16). Plaintiff cites Dr. Magurno's findings that plaintiff had only 3/5 grip strength in both her hands and had trouble using a zipper, buttons, and difficulty tying a bow on the right.[25] (Pl.'s Br. at 18) (citing T. 286). Dr. Magurno concluded that plaintiff had "marked" limitations on left-sided fine motor skills, she was only mildly limited on the right. (T. 288).

The court would first point out that Dr. Magurno questioned plaintiff's effort during the testing. (T. 287). The doctor stated that plaintiff had 3/5 strength in proximal and distal muscles of the hand, but "whether due to pain or lack of effort is not clear." (*Id.*) Plaintiff argues that her condition became even worse after Dr. Magurno's August 16, 2012 examination. However, a review of the treating physician's notes show that while plaintiff did complain of numbness in her right hand,

_____

the day), and she had a lot of friends come over to help, she was still able to feed the baby and change his diapers. (T. 63-65).

[25] This degree of limitation was never exhibited to her treating providers.

the subsequent examinations of both hands were generally "normal," and x-rays of her cervical spine showed only "mild" retrolisthesis.[26] (*See* T. 308, 310 (9/20/13); 312, 314 (7/2/13); 316, 318 (6/26/13)). On June 26, 2013, plaintiff complained of neck pain with right arm numbness. (T. 316). However, the physical examination showed "right arm tenderness dequervain [sic] tendon,[27] no synovitis, ***no weakness***." (T. 318) (emphasis added). On May 29, 2013, although plaintiff complained of tingling in her right hand, the physical examination showed was completely normal with a "full range of motion." (T. 321, 323).

On October 23, 2013, plaintiff continued to complain of right hand numbness with neck pain (for the past two months). (T. 375). However, her treating providers noted that plaintiff was in physical therapy "with improvement," and her physical examination showed "normal hands" bilaterally.[28] (T. 377). On October 25, 2013, Dr. Wiesner found that plaintiff's elbows, wrists, hands, and fingers had full range of motion, with some swelling of her MCP (metacarpophalangeal) joints. (T. 371). Dr.

---

[26] Cervical retrolisthesis is the backward displacement of the cervical vertebrae. basmedcol.edu.iq/media/2014/01/dr.-yas-retrolisthesis.pdf. Plaintiff's mild retrolisthesis was seen only on the June 26, 2013 x-ray's "extension view." (T. 320). This "resolved" on the flexion view, the alignment was "otherwise grossly maintained, no fractures were present, no significant degenerative disc disease or foraminal stenosis was seen. There was normal articulation of C1-C2, and soft tissues were normal. (*Id.*) The impression was "mild" abnormal motion at C3-C-4 with development of retrolisthesis, but no other abnormality was identified in the cervical spine.

[27] The De Quervain tendon is on the thumb side of the wrist. De Quervain tenosynovitis is a painful condition affecting this tendon, causing pain upon turning the wrist or making a fist. http://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/basics/definition/con-20027238. However, plaintiff's June 26, 2013 medical examination states that, although the tendon was "tender," there was no synovitis. (T. 318).

[28] Plaintiff was having a knee problem during this examination and during Dr. Wiesner's examination which occurred two days later. (T. 371, 377).

Wiesner found no "significant restrictions" in either hand for fine motor activities. (*Id.*) On December 6, 2013, plaintiff complained that swelling in her hand – which she told her treating providers began two weeks before – had caused "decreased" range of motion, but "motor and sensory are preserved." (T. 381). This was the first time that plaintiff's range of motion and strength were found to be decreased in the right hand ring and little fingers. (T. 383). Strength was "limited." (*Id.*) The joint pain was likely due to the SLE. X-rays were recommended, but steroids were not recommended at that time. (T. 383). The hand x-ray was normal. (T. 390). On January 13, 2014, the doctor prescribed Prednisone, but plaintiff's physical exam was "normal" with "tenderness" in the right hand, but no synovitis. (T. 390). On March 25, 2014, plaintiff's pain was listed at 0/10, and both of her hands were listed as "normal." (T. 387). Plaintiff's arm numbness was mentioned, but her physical examination was completely normal. (T. 387). Plaintiff's treating sources have never noted severe problems with plaintiff's ability to perform fine manipulations with her hands, and as stated above, while plaintiff has complained of numbness and tingling, the physical examinations of plaintiff's hands have been generally normal. There is no question that plaintiff suffers from SLE. The issue is the extent that the SLE limits her from work activities.

As stated above, conflicts in the evidence are for the ALJ to resolve. Although plaintiff cites all the reports which show more severe symptoms, there are as many, or more, of the reports that indicate lesser pain and symptoms. These reports exhibit conflicts in the evidence, and the ALJ's justification for her determination is supported by substantial evidence. The ALJ's rejection of the treating providers' "Questionnaire"

and Dr. Wiesner's RFC evaluation in favor of the information in Dr. Magurno's report and the progress notes of both the treating providers and Dr. Wiesner is supported by substantial evidence.

It is the province of the ALJ to accept parts of a doctor's opinion and reject others as long as the ALJ's conclusions are supported by substantial evidence in the record. *Matta v. Astrue*, 508 F. App'x 53, 56-57 (2d Cir. 2013) (although the ALJ's conclusion may not perfectly correspond with any of the medical source opinions cited in the decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole); *Veino v. Barnhart*, 312 F.3d 578, 588-89 (2d Cir. 2002) (ALJ did not err in crediting only a small part of treating physician's report). In *Kennedy v. Astrue*, the Second Circuit affirmed the ALJ's rejection of the treating physician's "check-box" form because "as the ALJ observed, the extreme impairment reflected on Dr. Steele's April 2005 form is not corroborated by the contemporaneous treatment notes compiled by Dr. Steele and his colleagues." *Kennedy v. Astrue*, 343 F. App'x 719, 721 (2d Cir. 2009). The same is true in this case, and thus, the ALJ's RFC determination is supported by substantial evidence.

## VII.  VOCATIONAL EXPERT/HYPOTHETICAL QUESTION

### A.    Legal Standards

If a claimant is unable to perform a full range of a particular exertional category of work, or the issue is whether a claimant's work skills are transferable to other jobs, then the ALJ may utilize the services of a vocational expert. 20 C.F.R. §§ 404.1566, 416.966. A vocational expert may provide testimony regarding the existence of jobs in

the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

If the ALJ utilizes a VE at the hearing, the VE is generally questioned using a hypothetical question that incorporates plaintiff's limitations. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996). Conversely, the ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *Id*. at 276-277.

## B.    Application

Plaintiff argues that the VE's determination is not supported by substantial evidence because the ALJ's RFC determination was not supported by substantial evidence, leading to an improper and incomplete hypothetical question. Because this court finds that the ALJ's RFC evaluation was supported by substantial evidence, the

hypothetical question is similarly supported. However, the court must comment on one of the plaintiff's arguments, even though the court has already determined that the ALJ appropriately given little weight to the medical reports which suggest "moderate" limitations in concentration and work pace.

Plaintiff argues that she is "unemployable" because her treating providers and Dr. Wiesner opined that she would be "moderately" limited in her concentration and her work pace. Each form defined a "moderate" limitation differently, but the court will assume counsel's definition of "moderate" as between 20% and 30% limited. At the hearing, plaintiff's counsel interpreted this limitation as being "off task" 20% of the work-day, to which the VE responded that there would be no jobs that plaintiff could perform. (T. 41-42). Plaintiff's counsel has made an inappropriate leap in analysis from the doctor stating that plaintiff would have a 20% limitation in her concentration or work pace to plaintiff being "off-task" for 20% of the day. That is not what the doctors were asked, and it is completely unclear whether such an assumption by counsel was warranted.[29]

---

[29] The court notes that, later in the VE's testimony, plaintiff's counsel asked the following question:

> Q. . . . I'm going to add three things to the hypothetical. So we again, we have a different person than . . . the ALJ described, and, and ask you for each, the effect. And the first two, you may have answered, and forgive me if this is included in the off task, but if you have greater than a 20 percent reduction in the ability to sustain work pace, does that basically kill the jobs for the off task answer?
>
> A. Yeah.
>
> Q. And the same thing - -
>
> A. Yes

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and plaintiff's complaint be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: May 16, 2016

*Andrew T. Baxter*

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

---

Q.    more than 20 percent reduction in ability to concentrate?

A.  Yes

Although the VE may have understood counsel's question, he was still asking about someone being "off task," thus, it is unclear whether counsel's question was appropriate.